UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| V. | ) | CRIMINAL DOCKET NO. |
| | ) | 04-CR-40027-FDS |
| ROBERT FAFARD | ) | |
|     Defendant | ) | |

### DEFENDANT, ROBERT FAFARD'S SENTENCING MEMORANDUM AND MOTIONS FOR DOWNWARD DEPARTURE

### SENTENCING MEMORANDUM

The defendant submits this memorandum pursuant to the Standing Order of the Court dated March 22, 2005 and moves for downward departure for reasons stated in this memorandum. The defendant regrets any inconvenience to the court caused by delay in filing said memorandum. In accordance therewith, the defendant proposes a non-guideline sentence of sixty months concurrent on counts 1, 2, 3 and 4, followed by a period of three years supervised release. The defendant requests that the court not impose any fines.

**I.   Request for Non-Guideline Sentence**

The defendant respectfully requests a non-guideline sentence. In support thereof, the defendant states as follows.

The sentencing guidelines are advisory, not mandatory. United States v. Booker, 125 S.Ct. 738 (2005). Although the sentencing courts now consult the guidelines in an advisory capacity, the court has discretion to consider other factors, including factors that have been previously discouraged or prohibited as appropriate sentencing factors, in

order to arrive at a sentence that is sufficient, but not greater than necessary, to comply with the purposes of sentencing. See 18 U.S.C. § 3553(a)(2)(A)(B)(C)(D). "The Guidelines and their policy statements are now factors to be weighed among the other statutory factors." United States v. Jaber, 362 F. Supp. 2d 365, 369 (D.Mass. 2005). There is no indication in Booker that the Supreme Court favored the now advisory guidelines with special weight. Support for this view is found in Justice Scalia's dissent in Booker,

> Thus logic compels the conclusion that the sentencing judge, after considering the recited factors (including the guidelines), has full discretion, as full as what he possessed before the act was passed, to sentence anywhere within the statutory range. If the majority thought otherwise – if it thought the Guidelines not only had to be 'considered' (as the amputated statute requires) but had generally to be followed – its opinion would surely say so.

Booker, supra at 791 (Scalia, J. dissenting). If the remedial majority felt that the guidelines were to be given substantial weight, or that a non-guideline sentence was to be imposed only upon a showing of clearly identified and persuasive reasons, it would have said so. Accordingly, the defendant respectfully suggests that allowing "substantial weight" to the sentence suggested by the guidelines, coupled with a requirement of a showing of "clearly identified and persuasive reasons" for the imposition of a "non-guideline" sentence, establishes a constitutionally infirm sentencing calculus in violation of the mandate of Booker and 18 U.S.C. § 3553(a). Accordingly, the defendant submits that he be sentenced in accordance with 18 U.S.C. § 3553(a)(2).

Pursuant to 18 U.S.C. § 3553(a)(2), the Court must impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in the statute at § 3553(a)(2), i.e., (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to

criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner.

## Presentence Guideline Calculations

In considering an appropriate sentence that is no greater than necessary to meet the purposes of sentencing, the court should consider that the guidelines as calculated in the presentence report (prior to any addendum) call for a sentence of 262 to 327 months. Probation has based its calculations on a cross-reference to a much more serious crime than the behavior for which Fafard is accountable. Both parties have filed objections to Probation's use of the cross-reference in this case. See Defendant's objections to PSR ¶¶36-42. Government's Objections to PSR ¶36. At this writing it is not known if Probation has agreed with the parties' objections.

The parties had carefully considered the guideline calculations in formulating their plea agreement. According to the Agreement's strict guideline calculations, the offense level resulted in a level 32, CHC I, for a range of 121 to 151 months. The Agreement contemplated the defendant's wish to argue that the guideline manual extant on November 1, 2003, was the more appropriate manual to use for the calculations, which argument the government would oppose.

The defendant submits for the court's consideration, that the least serious of the counts, Possession of Child Pornography, terminated the offense conduct on November 10, 2004, upon the defendant's arrest. There were no overt acts committed after November 1, 2004 and therefore it is more appropriate to use a manual in effect prior to November 1, 2004. The 2003 version of the guidelines results in an offense level 26,

3

CHC I, for a range of 63 -78 months. See Defendant's Objections to PSR ¶32. Regardless of any guideline range, the court is obliged to impose a mandatory minimum of five years.

In considering the nature and circumstances of the offense and the characteristics of the defendant, it should be noted that although the defendant's conduct is indeed serious, there is no evidence that the defendant has ever had any sexual contact with any child.  Nor does it seem possible that Fafard could have executed his fantasy, given his inability to walk or stand for even short periods of time.  Moreover, by providing the faux child with his real age and physique, the defendant might have ensured that any real child would not wish to have sexual contact with him.  Fafard's overt attempts to have contact with the faux child amounted to chat and mapquest searches (all prior to November 1, 2004).  Without excusing his behavior, it is probable that a healthy and active Fafard would not have been tempted to pursue a collection of child pornography or a sexually arousing chat with a minor.  In his 62 years of life, there have never been any accusations or hint of inappropriate behavior on his part.  Fafard's daughter reports to the Probation Officer that her father has been having mobility problems since about 1998. He closed his stove repair business when he could not longer stand up after repairing a stove.  She opines that her father has been extremely bored since he began to suffer with physical limitations and doesn't believe that her father would ever have actually met with the faux minor he was emailing because "he is too much of a coward, and because he would have been physically unable to do so.  She believes that he was bored, lonely, and sitting at home, probably drinking beer, and playing games by chatting online, pretending

4

to be whoever he wanted to be and trying to see how far he could take it online." PSR ¶80

Upon his arrest, Fafard stopped renovations on his home in the belief that he would admit his guilt and face the consequences. He is deeply remorseful and ashamed of his behavior.

As for the defendant's other personal characteristics, he is a 62 year-old man with a history of productive employment since he graduated from Worcester Boys Trade School in 1964. He served his country in the United States Army for two years and was honorably discharged in June 1967 and remained on the ready reserves until 1971. Although Fafard married and fathered two children, his marriage ended in divorce after 11 years. Nonetheless, Fafard maintained good relations with his children who he supported financially as well as emotionally. The daughter reports that she and her brother spent every weekend with their father when they were young. PSR ¶79. Clearly the children love their father and worry about his health and his own concerns that he will lose his home if he cannot pay the taxes while he is incarcerated. His daughter has offered to assume ownership of the home and pay the taxes while he is away so that he will have a place to live when he gets out of jail. PSR ¶82

Robert Fafard's health appears to be somewhat compromised. He has only recently been afforded an appointment with a doctor at UMass Medical Center. In all candor, the defendant admits that he had been ignoring his physical problems until he could not stand the pain in his knee. He applied for a Medicaid card and only recently has been able to make appointments. Since the disclosure of the presentence report, the defendant has been to see a doctor. On 8/17/2006, he was seen by Dr. Aretha Raj at the

5

UMASS Medical Center in Worcester. Dr. Raj examined the defendant and found him to have elevated blood pressure. She prescribed 25 mg of Hydrochlorothiazide for the hypertension. The defendant also had extreme knee pain for which Dr. Raj prescribed Ibuprophin 400 mg to be taken 3 times per day as needed. In addition Dr. Raj took blood and urine samples. Fafard kept a follow-up appointment on 8/28/06 with Dr. Raj and learned that he has a deteriorating liver and possible heart problem due to poor circulation. Dr. Raj prescribed Lisinoprior 10 mg for the liver and one aspirin 325 mg. daily. Dr. Raj scheduled the defendant for a cardiogram at UMass Hospital on September 6th at 10 AM.

The defendant has a very prominent tumor on his neck, which was especially concerning to Dr. Raj. She referred the defendant to Dr. Jeffrey Bernhard, chief of the Division of Dermatology at UMASS Medical Center, tel. 508-334-5979. The appointment with Dr. Bernhard is on 10/27/06 at 10:20 AM. The defendant is hopeful that the court will postpone his sentencing until he has seen Dr. Bernhard. While he understands that the Bureau of Prisons can and may deal with his medical problems, it could be many months before the Bureau is able to get him to Dr. Bernhard. Nor is there any guarantee that the Bureau will consider the defendant's compromised physical condition a matter of urgency. The defendant has been living with the tumor long enough for it to grow to its present size. There is some suspicion that it is cancerous. Now that the defendant is making and keeping his medical appointments, there can be no harm in postponing his sentencing date a few more weeks if only to provide the Bureau of Prisons with some medical records to follow-up on treatment.

Prior to the instant offense, there has never been a blemish on Fafard's life.

6

The Sentencing Commission currently uses criminal history as a tool to measure offender culpability, to deter criminal conduct and to protect the public.  USSG Ch. 4, Pt. A, intro. comment.  It is noteworthy that the criminal history purposes mirror the purposes laid out at § 3553(a)(2).  Thus, it is not inconsistent with the purposes of § 3553(a) to look to the defendant's criminal history in arriving at a just sentence.

In the instant case, the defendant has zero criminal history points.  The Commission conducted a recidivism study on first offenders, May 2004: Recidivism and the "First Offender" available on the Commission's website at www.ussc.gov This study recognizes that:

> The "first offender" philosophy in sentencing policy generally encourages lower sentences for offenders who have little or no prior criminal conduct.  This philosophy, which can be derived directly from the guidelines' Chapter Four introductory commentary, postulates that first offenders are less culpable and less likely to re-offend.  As such, they are deserving of reduced punishment.  Congress itself in the Sentencing Reform Act of 1984 promotes the first offender philosophy, citing the relevance of reduced sentencing levels for first offenders under the federal sentencing guidelines. [note 1, citing 28 U.S.C. §994(j).] *id* pg 1.

Without attempting to repeat the findings of the study here, the important and relevant points to Robert Fafard are summarized.  The study created three Groups within the category of "first offender."    All within the three Groups have zero criminal history points:  Group A, no arrests; Group B, no convictions; Group C, minor convictions only. *Id* pg 5.

Obviously, Robert Fafard fits as a Group A  first offender.  The Commission studied two-year recidivism rates and found that Group A has the lowest primary recidivism rate at 6.8 percent. *Id* pg 13-14.  "From both culpability and recidivism perspectives, group A offenders with no prior arrest, most strongly meet the conceptual

7

definition of the first offender category…they are easily the most empirically identifiable group of guideline federal offenders who are least likely to re-offend." *Id* pg 17.

Given that three of the purposes of sentencing are met by the defendant's criminal history category as a first offender, there appears to be little need to consider any punishment harsher than the mandatory minimum period of five years in prison.

Other indicators of low risk to recidivate are that an older, married person (even if divorced) who does not use drugs, who has an education is less likely to fail to recidivate than a younger drug addicted person with no real family ties. The defendant's personal history as well as the circumstances of the offense demonstrate that he is a low risk to recidivate.

The defendant respectfully requests that the court consider the 2003 guidelines manual calculations in contemplating the advisory guidelines for the following reasons. The increased penalty calculations of the 2004 manual are triggered by the least serious of the four counts, count four, Possession of Child Pornography, with a statutory maximum of ten years. This one count has triggered the increased guideline calculations because the government chose to arrest Mr. Fafard shortly after November 1, 2004, on November 10th. The 2004 guideline manual became effective on November 1, 2004, nine days prior to the defendant's arrest.

Robert Fafard faces the increased statutory penalties under the PROTECT Act. Count 1 carries the highest statutory penalty, mandatory minimum five years, maximum thirty years. At the very least, the defendant must serve five years. Nevertheless, the offense behavior under Count 1 ended on October 19, 2004, prior to the implementation of guideline amendments effective November 1, 2004. Counts two and three each carry

8

increased statutory penalties under the PROTECT Act, also five years mandatory minimum, maximum twenty years  Again, the behavior for these two counts ended on October 19, 2004, prior to the implementation of guideline amendments effective November 1, 2004.

To be sure, it is within the government's discretion to time an arrest when it is feasible, but it is also within the Court's discretion to consider the totality of the circumstances when applying the principles of Title 18 USC § 3553(a).  The guideline calculations of the 2003 manual are a better indication of the appropriate sentence for Fafard's criminal acts.  The low end, 63 months is within the mandatory minimum penalty the defendant faces.

The other pertinent factors to consider are the defendant's age and physical condition.  Fafard is an obese overweight, 62-year old man with hypertension, poor circulation, deteriorating liver, knee and back problems, unable to stand or walk for any period of time.   A lengthy incarceration may well take him close to the end of his life.  There is little danger that the defendant would ever repeat his offense.  He will be monitored by the Probation Department while on supervised release.  He has learned his lesson with regard to this type of offense.  A period of five years in jail is more than adequate to meet the purposes of this sentence and this offense.

**Departure due to age and infirmity under 5H1.1 and 5H1.4**

Finally, apart from asking this court to consider age and infirmity under 18 Section 3553(a), the defendant is requesting for a downward departure under U.S. Sentencing Guidelines Manual Sections 5H1.1 and 5H1.4. Although discouraged, 5H1.1 allows for a downward departure for age in cases where the defendant is elderly and

9

infirm. Although discouraged, 5H1.4 allows for a departure in cases involving extraordinary physical impairment. The defendant urges this court to grant such departure in the case at hand. As discussed above, the defendant is 62 years old and cannot walk unassisted. He uses a walker to get around. Even with a walker, the defendant moves very slowly and with great difficulty. Getting up and sitting down is a chore. Robert Fafard experiences severe knee pain. It also appears that he has a deteriorating liver, heart issues and a growth on his neck that could be cancerous.

                              THE DEFENDANT

                              /s/ Alan J. Black
       By:   ALAN JAY BLACK
                              1383 Main Street
                              Springfield, MA 01103
                              (413) 732-5381
                              BBO#553768

## **CERTIFICATE OF SERVICE**

     I hereby certify that this document filed through the ECF system will be sent electronically to David Hennessy, AUSA on this 5th day of September 2006.

                              /s/ Alan J. Black